NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Walter A. TORMASI,<br><br>      Plaintiff,<br><br>v.<br><br>George W. HAYMAN, et al.,<br><br>      Defendants. | Civ. No. 08-4950<br><br>OPINION & ORDER |

THOMPSON, U.S.D.J.

### INTRODUCTION

This matter comes before the Court upon Plaintiff Walter Tormasi's Motion for Partial Summary Judgment [docket #222]; Defendants' Motion for Summary Judgment [275]; and Plaintiff's Cross-Motion for Partial Summary Judgment [308]. This opinion considers only those portions of the motions that address whether Plaintiff exhausted his administrative remedies as required by 42 U.S.C. § 1997e(a).[1] The Court has decided the matter upon consideration of the parties' submissions, without holding oral argument, pursuant to Fed. R. Civ. P 78(b). For the reasons set forth below, Defendants' motion for summary judgment is denied, and Plaintiff's motions are granted in part and denied in part.

### BACKGROUND[2]

Plaintiff is an inmate confined at New Jersey State Prison ("NJSP") by the New Jersey Department of Corrections ("DOC"). (Third Am. Compl. ¶ 3) [159]. While confined at NJSP,

---

[1] In addition to these motions, there are three more motions for partial summary judgment pending before the Court, in which Plaintiff seeks summary judgment on a variety of issues [docket # 248, 358, 375]. Currently, the parties are completing discovery, and we believe that addressing these additional motions would be premature at this time. The entries will remain on the docket for consideration once discovery is completed.

[2] Any allegations taken from Plaintiff's Third Amended Complaint and not supported by other evidence are included for background purposes only and are not relied upon in deciding these motions.

1

Plaintiff was diagnosed with nearsightedness by personnel working for Correctional Medical Services, Inc. ("CMS")—a business contracted with the responsibility of providing medical services to NJSP.  (Third Am. Compl. ¶¶ 4(e), 7); (*see* Hutton Decl. Ex. B) [113-2, at 18].  Several years later, in December 2006, Plaintiff began experiencing further vision loss, and he submitted a medical request seeking optometry services.  (Third Am. Compl. ¶¶ 7, 10); (Defs.' Cross-Mot. for Summ. J. 7) [382].  Plaintiff was scheduled for an optometry appointment on January 11, 2007, but he missed the appointment because he was remanded to Somerset County Jail at the time.  (Tormasi Decl. Ex. B) [308-3]; (Defs.' Cross-Mot. for Summ. J. 7) [382].  During March and May 2007, Plaintiff made verbal inquiries about his medical request to unidentified CMS employees, who told him he would get an optometry examination.  (Third Am. Compl. ¶¶ 12, 13.)  Then on August 13, not having had his exam, Plaintiff submitted a grievance to DOC on the prescribed Inmate Remedy Form ("IRF").  (Tormasi Decl. Ex. A) [308-2].  He received a response in August from Defendant Jawana Bethea—the CMS Ombudsman—which stated that Bethea would "contact the scheduler to reschedule" and directed him to file another medical request slip.  (*Id.*)  Plaintiff complied, and the new request was again referred to the medical department in early September 2007.  (Third Am. Compl. ¶¶ 16–17.)  Plaintiff submitted another IRF in late September, which prompted a response from Defendant Bethea explaining that there had been a "mix up" and that Plaintiff would now be scheduled for an optometry appointment.  (Tormasi Decl. Ex. B) [308-3].  Plaintiff appealed this response to the prison administration on October 27 after several weeks passed without his appointment being scheduled.  (*Id.*)  His appeal was denied with the notation, "Response appropriate."  (*Id.*)

On November 5, Plaintiff submitted a letter to Malaka Umrani, the CMS hospital administrator, explaining his failed efforts to see an optometrist.  (Hutton Decl. Ex. B, at D28)

[275-6]. Plaintiff claims this letter was later forwarded to Defendant Jason Pugh and Paula Azara—Umrani's successors as hospital administrator. (Third Am. Compl. ¶ 22.) A little over a week later, he submitted a similar letter to Kathy O'Donnell, a CMS Ombudsman. (Hutton Decl. Ex. B, at D29) [275-6]. He claims he received a response from O'Donnell, who informed him that Defendant Lucile Roach, a CMS Nurse, would schedule his "long overdue exam." (Third Am. Compl. ¶ 22.) In mid-December 2007, Plaintiff received a copy of a CMS memorandum, sent by Defendant Bethea to an NJSP administrator, stating that Plaintiff would be seen for an eye exam as soon as scheduling would permit. (Hutton Decl. Ex. B, at D30) [275-6]. However, the eye exam was not scheduled until April 11, 2008, and in the interim Plaintiff submitted two more grievance letters to Defendant Bethea and made multiple verbal complaints. (Third Am. Compl. ¶¶ 25–28)

On April 11, CMS optometrist Robert A. Bucchino examined Plaintiff and wrote him a prescription for new eyeglasses. (Hutton Decl. Ex. B) [113-2, at 24–25]. Plaintiff alleges that this examination was done incorrectly and that as a result the prescription was not appropriate for his condition. (Third. Am. Compl. ¶ 28.) On May 9, Plaintiff filed a third IRF complaining that he had not yet received his eyeglasses; he did not receive a response on the grievance form. (Tormasi Decl. Ex. C) [308-4]. He then filed another IRF in June 2008 and received a response on June 10, directing him to seek redress through the medical request system rather than the administrative grievance system. (Tormasi Decl. Ex. D) [308-5]. Plaintiff claims that he complied and his medical request was endorsed. (Third Am. Compl. ¶¶ 34-35.) Then in early July, Plaintiff sent another letter to Umrani (which he alleges was again forwarded to Defendant Pugh) and two more letters to Defendant Bethea. (*Id.* ¶¶ 36, 38.) According to Plaintiff, Bethea visited his cell on July 24, admitted there had been a problem with producing Plaintiff's

3

eyeglasses, and told him that Defendant Roach was responsible for the matter.  (*Id.* at ¶ 39.) Plaintiff states that he again sent letters to Umrani (forwarded to Pugh and Azara) and Defendant Bethea and submitted another administrative grievance in August 2008.  (*Id.* ¶¶ 40–42.)  Then on September 5, Plaintiff again met with Bucchino, who assured him that he would receive his eyeglasses in the near future.  (*Id.* at ¶ 43); (Defs.' Cross-Mot. for Summ. J. 9) [382].  Finally, on September 26, 2008, Plaintiff received his prescription eyeglasses.  (Third Am. Compl. ¶ 44); (Defs.' Cross-Mot. for Summ. J. 9) [382].  However, Plaintiff found the eyeglasses were the wrong prescription and were thus ineffective.  (Third Am. Compl. ¶ 44.)

Plaintiff claims that Defendants' failure to give him an eye exam and a pair of functional eyeglasses has resulted in permanent loss of vision and physical injury to his eye.  (*Id.* ¶ 45.) This loss of vision is allegedly responsible for dizziness, headaches, disorientation, and loss of equilibrium which caused Plaintiff to fall and injure himself.  (*Id.*)  These physical injuries have in turn caused emotional distress.  (*Id.*)

Plaintiff instituted this lawsuit on October 7, 2008.  Extended motion practice has resulted in the dismissal of several defendants.  The remaining defendants are Lucile Roach, Jawana Bethea, and Jason Pugh, who Plaintiff claims were deliberately indifferent to his serious medical need in violation of the Eight Amendment.  A claim against Defendant Roach for violation of the Equal Protection Clause also remains.

## ANALYSIS

### A. Legal Standard

Summary judgment is proper when "the pleadings, the discovery and disclosure materials, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The Court will

"view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion." *Id.*; *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002). In resolving a motion for summary judgment, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986). More specifically, the Court must grant summary judgment against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the movant's motion is supported by facts, the party opposing summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). More than a "mere existence of a scintilla of evidence" supporting the non-moving party is required. *Anderson*, 477 U.S. at 252. Properly applied, Rule 56 will "isolate and dispose of factually unsupported claims or defenses" before those issues come to trial. *Celotex*, 477 U.S. at 323-24.

    **B. Exhaustion of Remedies Under the Prisoner Litigation Reform Act**

The PLRA provides that an inmate cannot bring a § 1983 claim with respect to prison conditions "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory even if the inmate believes such administrative remedies are futile and even if the available administrative processes cannot grant the desired remedy. *Booth v. Churner*, 532 U.S. 731, 739–41 (2001). To avoid procedural default of a claim, a plaintiff's exhaustion must be "proper," meaning the plaintiff must adhere to all procedural rules and deadlines. *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006). However, compliance is deemed

"satisfactory if it is substantial." *Nyhuis v. Reno*, 204 F.3d 65, 77–78 (3d Cir. 2000). In determining whether a plaintiff properly exhausted all available remedies, the prison's grievance procedures govern. *See Spruill v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004) ("prison grievance procedures supply the yardstick for measuring procedural default"); *Concepcion v. Morton*, 306 F.3d 1347, 1354–55 (3d Cir. 2002). Here, the parties agree that the NJSP Inmate Handbook ("the Handbook") prescribes the procedures inmates must follow, but they interpret some of its provisions differently.

Defendants argue that Plaintiff has not exhausted all administrative remedies available on two grounds: (1) Plaintiff failed to appeal the IRF dated August 13, 2007; and (2) Plaintiff failed to file a grievance with the Office of the Corrections Ombudsman.

Plaintiff concedes that he never appealed the August 13, 2007, IRF and that he did not therefore exhaust his administrative remedy on this particular grievance. (Tormasi Decl. ¶ 4) [308-1]. However, Plaintiff believes he cured this defect by filing subsequent IRF's, which he pursued through the available appeals process. (*Id.*) We agree that Plaintiff did not procedurally default his claims by failing to appeal the August 13 IRF. In that grievance, Plaintiff complained that he had not had his requested eye exam. Defendant Bethea responded that he had missed his appointment, but that she would "contact the scheduler to reschedule." (Tormasi Decl. Ex. B) [308-3]. With his complaint addressed and his eye exam set to be rescheduled, Plaintiff would have had no use for an appeal. But when a month passed and the remedy he was promised was still not delivered, Plaintiff chose to file a new IRF on September 21, 2007, rather than appeal the August 13 IRF. According to the inmate handbook, requests will normally be processed within thirty days, and "[a]dditional forms addressing the same problem or concerns are NOT to be

6

submitted before the end of this 30 day working period, and will not be processed if received." [3] (Hutton Decl. Ex. A, at 97–98) (hereafter "Handbook") [275-6]. By implication, an inmate may resubmit a request once the thirty days have elapsed. Here, Plaintiff waited thirty days, and when he still had not been seen by an optometrist, he filed another request. Defendant Bethea apparently did not believe this second request was improper. Instead, she responded to the IRF, stating that there had been a "mix up" and that Plaintiff would be scheduled for an exam. Under the circumstances, we find that it was not improper for Plaintiff to file this second IRF, that he did not forfeit his claim by failing to appeal the August 13 IRF, and that he adequately exhausted the available administrative remedies when he pursued the September 21 IRF through to completion of the appeals process.

Defendants' second argument is that Plaintiff failed to exhaust all administrative remedies because he never filed a grievance or complaint with the Office of the Corrections Ombudsman ("Ombudsman")—a division of the Department of the Public Advocate that is described in the Handbook as "independent from and external to the correctional facilities [the Ombudsman] investigates." (Handbook at 94.) The Handbook states that the Ombudsman "investigates complaints where the inmate has failed to get satisfactory results through available institutional channels." (*Id.*) In pertinent part, the Handbook reads: the Ombudsman "supplements, but does not replace the existing correctional facility's remedy/grievance process. Therefore, it is highly recommended that inmates utilize all institutional resources and grievance procedures prior to contacting the Office of the Ombudsman." (Handbook at 95). Defendants argue that, because the Ombudsman supplements the grievance process and provides inmates with another avenue for redress, a complaint to the Ombudsman is an available administrative

---

[3] Multiple requests on the same subject may be deemed abusive and subject an inmate to disciplinary action, (Handbook at 98), but Plaintiff's second IRF does not appear to have been deemed abusive.

remedy that Plaintiff was required to exhaust. (Defs.' Reply Br. 2) [314]. In response, Plaintiff states that, because the Ombudsman is external to and independent from the DOC, prisoners are not required to pursue this extra-departmental grievance mechanism. (Pl.'s Reply Br. 2) [321].

      We agree with Plaintiff that he exhausted his administrative remedies when he completed the IRF appeals process and that he was not required to take the extra step of filing a grievance with the Ombudsman. In effect, Defendants ask us to rule that inmates are required to pursue all non-judicial means of relief—even those external to the NJSP or NJDOC administrative system—before filing a lawsuit. In fairness to Defendants' position, the PLRA makes no distinction between remedies that are internal to the particular prison facility or the government agency administering the prisons (e.g. the Federal Bureau of Prisons or the NJDOC) and those remedies that may be available through other government agencies. Also, courts have required inmates to pursue appeals that go beyond the facility level. For instance, inmates in the federal prison system are required, after exhausting all avenues at the prison level, to appeal to the Bureau of Prisons' Regional Directors and then to the Central Office. 28 CFR § 542.15(a); *see also Johnson v. Thyng*, 369 F. App'x 144, 147–148 (1st Cir. 2010) (prisoner failed to exhaust his administrative remedies because he did not complete a third-level appeal to the Commissioner of the New Hampshire DOC after he had completed the grievance process at the institutional level).

      However, these cases address only appeals to higher authorities within the same government agency. Defendants have not cited to any cases in which a court required an inmate to avail himself of an outside agency system such as that of the Ombudsman. In fact, in the only case we could locate that explicitly recognized the distinction between internal and external remedies systems, the court held that "the [PLRA] does not require that prisoners do more than exhaust the prison's internal administrative grievance system. . . . [P]laintiffs' failure to use the

8

external administrative procedure . . . in addition to the internal [DOC] procedure . . . does not constitute a failure to exhaust available administrative remedies under [the PLRA]." *Aiello v. Litscher*, 104 F. Supp. 2d 1068, 1074 (W.D. Wis. 2000). Similarly, several cases in this circuit have emphasized the word "internal" when referring to the administrative processes a plaintiff must follow. *See Nyhius v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000) ("Congress merely meant to convey that if a prison provided no internal remedies, exhaustion would not be required."); *Scott v. Corr. Med. Servs.*, 2010 WL 3724126, at *5 (D.N.J. 2010) ("[I]t is critical that a prisoner participate in a prison's internal process . . . ."); *Mayne v. DiMarco,* 2007 WL 2122040, at *4 (D.N.J. 2007) ("[Plaintiff] was required to exhaust his administrative remedies, available to him through the internal inmate grievance procedure . . . ."). Although none of those cases address the precise issue here, their language is instructive and it supports our conclusion that Plaintiff was not required to file a grievance with the Ombudsman before suing in federal court. Moreover, even if we were inclined to view the Ombudsman process as part of the inmate grievance system, we would still find that Plaintiff's compliance was "substantial." *See Nyhuis*, 204 F.3d at 77–78. Accordingly, his case cannot be dismissed for failure to exhaust all available administrative remedies.

CONCLUSION

For the foregoing reasons, IT IS on this 2nd day of February, 2011,

ORDERED that Plaintiff's Motion for Partial Summary Judgment [docket # 222] is GRANTED as to the exhaustion of remedies issue and DENIED as to all other issues raised; and it is

ORDERED that Defendants' Motion for Summary Judgment [275] is DENIED; and it is

ORDERED that Plaintiff's Cross-Motion for Partial Summary Judgment [308] is GRANTED as to the exhaustion of remedies issue and DENIED as to all other issues raised.

*/s/ Anne E. Thompson*
ANNE E. THOMPSON, U.S.D.J.